UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KATAHDIN PAPER COMPANY, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-64-B-W |
| ) | |
| U&R SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**
**WITH INCORPORATED MEMORANDUM OF LAW**

NOW COMES the Plaintiff, Katahdin Paper Company, LLC ("Katahdin"), by and through its undersigned counsel, and, pursuant to Fed.R.Civ.P. 55(b)(2), moves this Court for the entry of a default judgment in its favor on all counts of its Complaint.

**I.  PROCEDURAL HISTORY**

Katahdin filed its Complaint in this matter on May 4, 2005, seeking monetary damages against U&R Systems, Inc. ("U&R") on claims of breach of contract and breach of express and implied warranties.  U&R was served with the Summons and Complaint pursuant to the Hauge Convention on May 18, 2005.  After U&R failed to file a responsive pleading within the required time for doing so, the Clerk entered a Default against U&R on June 9, 2005.

**II.  FACTS**

Once a Default has been entered against a defendant, the plaintiff's factual and legal claims must be taken as true and be considered established as a matter of law.  See Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63 (1st Cir. 2002); Libertad v. Sanchez, 215 F.3d 206, 208 (1st Cir. 2000).  Applying this standard, the following facts must be accepted as true:

Katahdin owns and operates paper-manufacturing facilities in East Millinocket, Maine. (Complaint ¶ 5). Katahdin manufactures paper and operates certain cogeneration facilities to power its operations, including Boiler No. 3, a bark-burning boiler (the "Bark Burning Boiler"). (Id. at ¶¶ 1, 5). The Bark Burning Boiler generates power by burning bark. (Id. at ¶ 6). When bark is burned, large quantities of ash and other debris are generated in the firebox where the bark is burned. (Id.). This ash and debris must be removed from the firebox. (Id.).

Prior to May 2004, Katahdin personnel manually operated rakes to remove ash and other debris through grates on the floor of the firebox and onto a chain conveyor system in the space below the firebox. (Id. at ¶ 7). Because this procedure was cumbersome and inefficient, Katahdin sought to acquire a mechanized rake system to perform this task. (Id.).

Katahdin contacted U&R, a Canadian company based in Vancouver, British Columbia, that designs and manufactures boiler components. (Id. at ¶ 2). Katahdin contracted with U&R to purchase a mechanized ash rake (the "Ash Rake") for clearing ash and other debris out of the firebox for $138,100, of which amount $96,670 has been paid. (Id. at ¶ 8).

Concerned that the existing grates in the Bark Burning Boiler might not be compatible with the Ash Rake, a U&R representative recommended that Katahdin install six new mechanized grates (the "Grates") on the floor of the firebox for use in conjunction with the Ash Rake. (Id. at ¶ 9). Katahdin contracted to purchase the Grates from U&R, and U&R warranted that the Grates would be free of design or manufacturing defects. (Id. at ¶¶ 9, 12, 13).

U&R personnel observed the operation and configuration of the Bark Burning Boiler prior to the design, manufacture, and installation of the Grates. (Id. at ¶ 10). U&R custom designed and manufactured the mechanized Grates for installation in the Bark Burning Boiler. (Id.). U&R's design used a stiff chain drive mechanism to open and close the Grates. (Id. at ¶

11).  The stiff chain is like a large bicycle chain with rollers on the outside. (Id.).  The rollers fit into a track (or "chain way") in which the chain should move up and down. (Id.).  Because of the narrow clearance between the rollers and the track, this was a design suited for a clean, debris-free environment. (Id.).

A third-party contractor installed the Grates on or about May 8, 2004. (Id. at ¶¶ 14-15).  A U&R representative was present as the Grates were being installed and was also present for a test of the Grates that was performed under cold conditions, *i.e.,* without fire in the firebox. (Id. at ¶ 15).  However, notwithstanding Katahdin's expectations and specific request that he stay, the U&R departed before the Bark Burning Boiler was started and the Grates could be tested under operational conditions. (Id.).  In other words, U&R only observed and tested the operation of Grates while the boiler was "cold." (Id.).

Within days of their installation the Grates started to "freeze," either in the open or the closed position. (Id. at ¶ 17).   Less than four weeks after their installation, Katahdin notified U&R that the Grates were malfunctioning. (Id. at ¶ 18).  Written notice was given in a letter from Katahdin to U&R dated June 28, 2004. (Id.).

Despite Katahdin's request for assistance, U&R did not, and has not, sent a representative back to East Millinocket to fix the problem, or even to investigate. (Id. at ¶ 19).  However, at U&R's recommendation, and at great expense, Katahdin undertook a number of steps to correct the problem with the sticking Grates, including installation of a system that would mechanically force the Grates downward (U&R's design relied on gravity), and installation of an air blower system to keep the chain system free of debris. (Id. at ¶ 20).  Those efforts proved unsuccessful. (Id.).

On February 16, 2005, two and a half weeks after giving written notice to U&R of its intention to remove the Grates and inviting U&R one last time to observe their condition, Katahdin removed the malfunctioning Grates. (Id. at ¶ 21).

Inspection of the U&R grate system, both before and after its removal, established that the chain drive system was not equipped to prevent ash and other debris generated in the ordinary course of operating the Bark Burning Boiler from getting into the track in which the chain runs and obstructing its movement. (Id. at ¶ 22). U&R's design was destined to fail because ash and other debris were inevitably going to become wedged between the chain rollers and the track in which they run, causing the chain to jam. (Id. at ¶ 23). The Grates should have been designed with greater clearance, and/or the U&R representative on site in East Millinocket should have recommended greater trimming of the Grates, to prevent them from hanging up (getting stuck) on other boiler components. (Id. at ¶ 24).

### III.  CALCULATION OF DAMAGES

Since Katahdin's claims of breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose have been established, the Court's task is simply to calculate the damages arising from each claim. The contract and warranty claims are discussed, in turn, below.

    A.    Breach Of Contract

The purpose of an award of compensatory damages for a breach of contract is to place the plaintiff in the same position it would have enjoyed had there been no breach. See Down East Energy Corp. v. RMR, Inc., 677 A.2d 1070, 1073 (Me. 1996). An injured party is entitled to recover all losses actually suffered as a result of the breach. See Lee v. Scotia Prince Cruises, Ltd., 2004 ME 78, ¶ 22, 828 A.2d 210, 216; Marchesseault v. Jackson, 611 A.2d 95, 98 (Me.

1992). Compensatory damages in a contract action can take two forms – general or specific (consequential) damages. Katahdin is entitled to both forms of damages here.

### 1. General Damages

In a contract action, general damages include the plaintiff's loss of the benefit of the bargain. See Deering Ice Cream Corp. v. Colombo, Inc., 598 A.2d 454, 456-57 (Me. 1991). Here, Katahdin contracted for the design and manufacture of custom made grates for the Bark Burning Boiler that never worked, and which impeded the operation of the Bark Burning Boiler. (Affidavit of Thomas W. Malikowski "Malikowski Aff." at ¶¶ 7, 22). Despite paying $214,700.00 for the Grates,[1] the only "benefit" Katahdin received from this contract was 9.5 tons of molten scrap metal worth $415.25. (Malikowsi Aff. at ¶¶ 10-11).

### 2. Consequential Damages

In addition to general damages, a plaintiff is entitled to recover as consequential damages those damages that were reasonably within the contemplation of the parties at the time the contract was made. See Forbes v. Wells Beach Casino, Inc., 409 A.2d 646, 655 (Me. 1979); Winship v. Brewer Sch. Comm., 390 A.2d 1089, 1095 (Me. 1978). In this case, there are two items of damages that were clearly within the parties' contemplation at the time the contract was made.

First, U&R's design for the Grates included the use of pneumatic cylinders that had to be purchased from a different vendor. (Malikowski Aff. at ¶ 12). Katahdin purchased those cylinders from Leen Company for the price of $5,087.88. (Malikowski Aff. at ¶ 12 & Exh. D).

---

[1] The purchase order actually calls for payments totaling approximately $226,000. (Malikowski Aff. at ¶ 10 & Exhibit B). Katahdin actually made payments to U&R totaling $214,700. (Malikowski Aff. ¶ 10 & Exhibit C). The difference between the purchase order price and the amount paid is a retainable amount that Katahdin has withheld. (Malikowski Aff. ¶ 10).

1033881.1

Clearly then, the parties contemplated that Katahdin would incur costs associated with the purchase of items specified in U&R's design.

Second, Katahdin incurred costs in connection with the Grates' installation. Because U&R was not responsible for the installation of the Grates, Katahdin paid FASTCO Corporation $190,311.92 to install the Grates. (Malikowski Aff. at ¶ 13 & Exh. E).[2] It takes no great leap of logic to conclude that the Grates U&R custom designed and manufactured for the Bark Burning Boiler would actually need to be installed in the Bark Burning Boiler.

Thus, the consequential damages total $195,399.80.

B.   Breach Of Warranty

A plaintiff who has prevailed on a breach of warranty claim may recover for direct, incidental, and consequential damages. See 11 M.R.S.A. §§ 2-714 and 2-715; see also S.H. Nevers Corp. v. Husky Hydraulics, Inc., 408 A.2d 676, 681 (Me. 1979). Here, Katahdin is entitled to recover all of these types of damages.

   1.   *Direct Damages*

The general test for direct damages in a breach of warranty action is set forth in 11 M.R.S.A. § 2-714(2), which provides:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

See also Faulkingham v. Seacoast Subaru, Inc., 619 A.2d 987, 988 (Me. 1993).

---

[2] The discrepancy between the original purchase order amount ($84,604.00) and the amount ultimately paid to FASTCO ($190,311.92) is due to: (1) the fact that U&R made numerous revisions to its plans and changed the scope of the installer's work; and (2) fabrication problems caused during manufacture. (Malikowski Aff. at ¶ 13).

1033881.1

The contract price is competent evidence of the value of the goods as warranted. See e.g., Manouchehri v. Heim, 123 N.M. 439, 941 P.2d 978, 981 (N.M. 1997). Indeed, that is the position taken by the leading commentators on the Uniform Commercial Code. See 1 James J. White & Robert S. Summers, Uniform Commercial Code, § 10-2 (4th ed. 1995) ("[T]he purchase price of the damaged goods may be the best evidence of the value of the goods as warranted.") (cases cited therein). Here, the contract price of the Grates, and, thus, their value as warranted, was $214,700.00. (Malikowski Aff. at ¶ 10).

The Grates were useless to Katahdin because they did not work and actually impeded the Bark Burning Boiler's operation. (Malikowski Aff. at ¶¶ 7, 22). In fact, even after performing a series of attempted fixes recommended or approved by U&R, the Grates never worked. (Malikowski Aff. at ¶ 7). Katahdin, however, can salvage some value from the Grates – they have a scrap value of $451.25. (Malikowski Aff. ¶ 11). The scrap value of an otherwise worthless good is competent evidence of the good's value at the time of acceptance. See e.g., Schroeder v. Barth, Inc., 969 F.2d 421, 423 (7th Cir. 1992); Intervale Steel Corp. v. Borg & Beck Division, Borg-Warner Corp., 578 F. Supp. 1081, 1091 (E.D. Mich. 1984).

The direct damages on the warranty claims, therefore, total $214,248.75.

    2.    *Incidental Damages*

Incidental damages include "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and *any other reasonable expense incident to the delay or other breach*." 11 M.R.S.A. § 2-715(1) (emphasis added). Here, Katahdin is entitled to recover two categories of incidental damages.

The first category consists of the costs incurred in performing attempted repairs prescribed by U&R following the Grates' installation. Those costs include the following:

1. $1,898.05 paid to FASTCO to trim the Grates to permit them to properly open and close (Malikowski Aff. ¶ 14 & Exh. F);

2. $1,447.20 paid to Leen Company for pneumatic valves to mechanically open the Grates that had been "freezing" in the closed position (Malikowski Aff. at ¶ 15 & Exh. G);

3. $4,015.00 paid to Northeast Industrial Service Company to install a chain way air supply in order to keep the chain way free of ash and other debris (Malikowski Aff. at ¶ 16 & Exh. H);

4. $1,602.00 paid to Castine Energy Services, Inc. to vulcanize new chain way expansion joints to replace the original U&R expansion joints that had failed (Malikowski Aff. at ¶ 17 & Exh. I);

5. $4,360.00 paid to Flow Tech for the manufacture of the new chain way expansion joints vulcanized by Castine Energy Services, Inc. (Malikowski Aff. at ¶ 18 & Exh. J-K);

6. $37,000.00 paid to Northern Construction Services, Inc. for the installation of a new chain way air supply system to each of the six chain ways controlling the six grates (Malikowski Aff. at ¶ 19 & Exh. L-M);

7. $8,614.13 in extraordinary internal labor and material costs incurred by Katahdin in connection with its efforts to keep the Grates operating (Malikowski Aff. at ¶ 20 & Exh. N);

8. $8,000.90 paid to Walker Industrial, Inc. to hydroblast the firebox, on three occasions, to remove hardened ash that had built up, preventing manual ash removal (Malikowski Aff. at ¶ 21 & Exh. O-P);

9. $12,530.65 paid to FASTCO to remove the Grates after the attempted fixes proved to be futile. (Malikowski Aff. at ¶ 22 & Exh. R).

The second category of incidental damages is closely related to the first. On three occasions – May 26, 2004, December 31, 2004, and January 14, 2005 – Katahdin had to shut down the Bark Burning Boiler's firebox in order to conduct some of the attempted repairs noted above. (Affidavit of Rodney D. Morrow "Morrow Aff." at ¶ 4). Rather than shut down the Bark

Burning Boiler entirely, Katahdin continued to operate the Bark Burning Boiler burning fuel oil via a backup system that does not employ the firebox. (Morrow Aff. at ¶ 5). The cost of the fuel oil needed to run the Bark Burning Boiler on the three dates in question totals $9,865.00. (Morrow Aff. at ¶ 6 & Exh. A).

The incidental damages total $89,332.93.

       3.      *Consequential Damages*

Consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." 11 M.R.S.A. § 2-715(2)(a). Since this standard essentially mirrors the standard for consequential damage recovery in a contract action discussed in Section III(A)(2) above, the consequential damages to which Katahdin is entitled on its warranty claims is the same as those to which it is entitled on its contract claim.

       C.      <u>Reconciliation Of Damages</u>

Obviously, there is a great deal of overlap in the damages Katahdin is entitled to recover on its contract and warranty claims. In recognition of the fact that Katahdin is not entitled to "double dip," <u>see</u> <u>Theriault v. Swan</u>, 558 A.2d 369, 372 (Me. 1989), set forth below is a reconciliation of the damages to arrive at the final damages figure:[3]

| | |
|---|---|
| General Contract/Direct Warranty Damages: | $214,248.75 |
| Incidental Warranty Damages: | $89,332.93 |
| Consequential Contract/Warranty Damages: | $195,399.80 |
| TOTAL: | $498,981.48 |

---

[3] A summary of the items of damages for which Katahdin is seeking to recover is attached hereto as Exhibit A.

IV. **CONCLUSION**

For all of the foregoing reasons, Plaintiff's Motion for Default Judgment should be granted, and a Default Judgment entered on Plaintiff's behalf in the amount of $498,981.48.

Dated: July 5, 2005

                                              Respectfully submitted,

/s/ Jonathan S. Piper
Jonathan S. Piper

/s/ Roy T. Pierce
Roy T. Pierce

/s/ Jonathan Mermin
Jonathan Mermin

PRETI, FLAHERTY, BELIVEAU,
PACHIOS & HALEY, LLP
One City Center
P.O. Box 9546
Portland, Maine 04112-9546
(207) 791-3000
jpiper@preti.com
rpierce@preti.com
jmermin@preti.com

1033881.1