UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KATAHDIN PAPER COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-05-64-B-W |
| | ) | |
| U&R SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Katahdin Paper Company, LLC's ("Katahdin") requests default judgment against U&R Systems, Inc. ("U&R"). Katahdin has satisfied this Court that U&R did not "appear" in this matter within the meaning of Fed. R. Civ. P. 55(b)(2) as interpreted by *Key Bank of Maine v. Tablecloth Textile Co. Corp.*, 74 F.3d 349 (1st Cir. 1996) and that it has a proper evidentiary and legal basis for its damages claim. This Court, therefore, GRANTS Katahdin's Motion for Default Judgment and ORDERS Default Judgment entered on Katahdin's behalf in the amount of $498,981.48.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

    **A. Facts As Alleged in the Complaint**

Katahdin's allegations against U&R are "taken as true and . . . considered established as a matter of law." *Libertad v. Sanchez*, 215 F.3d 206, 208 (1st Cir. 2000) (quoting *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir. 1985)); *see also In re Home Rests., Inc.*, 285 F.3d 111, 114 (1st Cir. 2002) (citing *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability. . . .")). Katahdin owns and

operates paper-manufacturing facilities in East Millinocket, Maine. Complaint at ¶ 5. To generate power, Katahdin maintains a bark-burning boiler (the "Bark Burning Boiler"). *Id*. at ¶¶ 1, 5, 6. When bark is burned, large quantities of ash and other debris are generated in the firebox. *Id*. at ¶ 6. This ash and debris must be removed. *Id*. Prior to May 2004, Katahdin employees manually operated rakes to sift ash and other debris through grates on the floor of the firebox and onto a chain conveyor system. *Id*. at ¶ 7. Because this procedure was cumbersome and inefficient, Katahdin sought a mechanized rake system to perform this task. *Id*.

U&R, a Canadian company based in Vancouver, British Columbia, designs and manufactures boiler components. Katahdin contracted with U&R to purchase a mechanized ash rake (the "Ash Rake") for clearing ash and other debris out of the firebox for $138,100 of which Katahdin has paid $96,670. *Id*. at ¶¶ 2, 8. Concerned that the existing grates in the Bark Burning Boiler might not be compatible with the Ash Rake, a U&R representative recommended that Katahdin install six new mechanized grates (the "Grates") on the floor of the firebox for use in conjunction with the Ash Rake. *Id*. at ¶ 9. Katahdin contracted to purchase the Grates from U&R, and U&R warranted that the Grates would be free of design or manufacturing defects. *Id*. at ¶¶ 9, 13. Katahdin paid $214,700 for the Grates. *Id*. at ¶ 12.

U&R personnel observed the operation and configuration of the Bark Burning Boiler prior to the design, manufacture, and installation of the Grates. *Id*. at ¶ 10. U&R then custom designed and manufactured the mechanized Grates for installation in the Bark Burning Boiler. *Id*. U&R's design used a stiff chain drive mechanism to open and close the Grates. *Id*. at ¶ 11. The stiff chain is like a large bicycle chain with rollers on the outside. *Id*. The rollers fit into a track (or "chain way") in which the chain should move up and down. *Id*. Because of the narrow

clearance between the rollers and the track, this design provided for a clean, debris-free environment. *Id*.

A third-party contractor installed the Grates on or about May 8, 2004. *Id.* at ¶¶ 14-16. A U&R representative was present as the Grates were being installed and for a test of the Grates under cold conditions, *i.e.,* without fire in the firebox. *Id.* at ¶ 15. Notwithstanding Katahdin's expectations and specific request, the U&R representative departed before the Bark Burning Boiler was started and thus before the Grates could be tested under operational conditions. *Id*. Within days of installation, the Grates started to "freeze," either in the open or the closed position. *Id.* at ¶ 17. Less than four weeks after installation, Katahdin notified U&R that the Grates were malfunctioning. *Id.* at ¶ 18. Written notice was given from Katahdin to U&R in a letter dated June 28, 2004. *Id*.

Despite Katahdin's request for assistance, U&R did not, and has not, sent a representative to East Millinocket to fix the problem, or even to investigate. *Id.* at ¶ 19. However, at U&R's recommendation, and at great expense, Katahdin undertook a number of steps to correct the problem with the sticking Grates, including the installation of a system to mechanically force the Grates downward (U&R's design relied on gravity), and the installation of an air blower system to keep the chain system free of debris. *Id.* at ¶ 20. These remedial efforts proved unsuccessful. *Id*.

On February 16, 2005, two and a half weeks after giving written notice to U&R of its intention to remove the Grates and inviting U&R one final opportunity to observe their condition, Katahdin removed the malfunctioning Grates. *Id.* at ¶ 21. Inspection of the U&R grate system, both before and after removal, established that the chain drive system was not equipped to prevent ash and other debris generated in the ordinary course of operating the Bark

Burning Boiler from getting into the track in which the chain runs and obstructing its movement. *Id.* at ¶ 22.  U&R's design was destined to fail because ash and other debris were inevitably going to become wedged between the chain rollers and the track in which they run, causing the chain to jam. *Id.* at ¶ 23. The Grates should have been designed with greater clearance, and/or the U&R representative on site in East Millinocket should have recommended greater trimming of the Grates, to prevent them from hanging up (getting stuck) on other boiler components. *Id.* at ¶ 24.

### B.  Procedural History

On May 4, 2005, Katahdin filed a Complaint against U&R.  (Docket #1).  The Complaint had four counts: 1) Count I, breach of contract; 2) Count II, breach of express warranty; 3) Count III,  breach of implied warranty of merchantability in violation of 11 M.R.S.A. § 2-314; and, 4) Count IV, breach of implied warranty of fitness for a particular purpose in violation of 11 M.R.S.A. § 2-315.  Katahdin requested *inter alia*: compensatory, incidental, and consequential damages arising from U&R's breaches of contract, express warranty, and implied warranties.

U&R was served on May 18, 2005. (Docket #4).  After U&R failed to answer, Katahdin moved for entry of default, and the Clerk entered default on June 9, 2005.  (Docket #6).  On July 5, 2005, Katahdin filed a Motion for Default Judgment.  (Docket #7).  This Court issued an Order on August 9, 2005  that required Katahdin to elect between: 1) requesting a damages hearing after giving U&R notice of the hearing in accordance with Rule 55(b)(2); or, 2) filing an affidavit setting forth facts sufficient for the Court to conclude that U&R failed to appear and resting on the previously filed affidavits in lieu of a damages hearing. (Docket #10).  Katahdin responded with a memorandum and affidavit. (Docket #11).

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 55(a) states that when a party against whom a judgment for affirmative relief is sought fails to plead or otherwise defend, as "made to appear by affidavit or otherwise," the clerk shall enter the party's default. However, liability and the amount of damages are not necessarily established as a result of the default. *E.g., Ohio Cent. R.R. Co. v. Central Trust Co.*, 133 U.S. 83, 91 (1890) ("[I]f [the allegations] are indefinite, or the demand of the complainant is in its nature uncertain, the requisite certainty must be afforded by proof"); *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) ("[F]acts which are not established by the pleadings . . . or claims which are not well pleaded, are not binding and cannot support the judgment"); *see also Federal Practice and Procedure* § 2688. Rule 55(b)(2) allows the district court discretion to determine the scope of the damages hearing to be held. (The district court "may conduct such hearings… as it deems necessary and proper…."); *Brockton Sav. Bank*, 771 F.2d at 12 n.8.

### B. U&R's Appearance Under *Key Bank*

This Court's first concern was whether Katahdin had satisfied the First Circuit's interpretation of an appearance in the context of default judgment. In *Key Bank*, the First Circuit stated: "although appearance in an action typically involves some presentation or submission to the court -- a feature missing here -- we have held that a defaulting party 'has appeared' for Rule 55 purposes if it has 'indicated to the moving party a clear purpose to defend the suit.'" 74 F.3d at 353 (citing *Muñiz v. Vidal*, 739 F.2d 699, 700 (1st Cir. 1984)). Notice is required if there were any "informal contacts" between the parties that demonstrate "a clear intent to defend." *Key Bank*, 74 F.3d at 353. This Court issued an Order, requiring Katahdin to respond to the *Key*

*Bank* issue. (Docket #10). On August 15, 2005, Katahdin filed a response including an affidavit from Attorney Jonathan S. Piper, clarifying that no *Key Bank* contacts have been made. (Docket #11, Exhibits A, B, C). Having reviewed Mr. Piper's affidavit and exhibits, this Court is satisfied U&R has not indicated a clear purpose to defend the suit nor has it otherwise appeared in the action. *Key Bank,* 74 F.3d at 353; F. R. Civ. P. 55(b)(2).

### C. Liability

Based on the facts alleged by Katahdin and accepted as true by U&R's default, this Court finds there is a factual basis for liability under each count in Katahdin's Complaint.

### D. Damages

That leaves damages. Once liability is found, the [factfinder] is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss. *Libertad*, 215 F.3d at 208 (quoting *Smith v. Wade*, 461 U.S. 30, 52 (1983)). Although the allegations in Katahdin's complaint against U&R are accepted as true, *see Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.*, 982 F.2d 686, 693 (1st Cir. 1993), damages must be established by proof unless the damages involve a "sum certain" or are for "liquidated damages". *See* Fed. R. Civ. P. 55(b)(1); *KPS & Assocs., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 19 (1st Cir. 2003). Neither *KPS* exception obtains here.

Katahdin alleges the following damages:

**DATE COST ITEM COST**

| Date | Item | Cost |
|---|---|---|
| 12/1/2003 | P045318 to U&R Systems for dump grates | $214,700.00 |
|  | (Credit of $451.25 for scrap) | ($   451.25) |
| 3/17/2004 | P047402 to Leen Co. for pneumatic cylinders | $  5,087.88 |
| 3/29/2004 | P047562 to FASTCO for dump grate installation | $190,311.92 |
| 5/24/2004 | P048773 to FASTCO to repair sticking dump grates | $  1,898.05 |
| 6/17/2004 | P049514 to Leen Co. for pneumatic valves | $  1,447.20 |
| 8/26/2004 | P051455 to NISCO to install chain way air supply connection | $  4,015.00 |
| 9/13/2004 | P051891 to CES to vulcanize new chain way expansion joints | $  1,602.00 |

6

| | | |
|---|---|---:|
| 9/13/2004 | P051892 to Flow-Tech for new chain way expansion joints | $ 4,360.00 |
| 10/11/2004 | P052049 to NCS to install new chain way air supply system | $ 37,000.00 |
| 1/13/2005 | KPC labor and material to keep dump grates operating | $ 8,614.13 |
| 12/30/2004 | P054300 Walker Industrial to water blast dump grates | $ 8,000.90 |
| 2/1/2005 | P054765 to FASTCO to remove U&R dump grates | $ 12,530.65 |
| | **Total Expenses** | **$ 489,116.48** |
| | | |
| 5/24/2004 | KPC cost to burn more expensive fuel (oil) during dump grate repairs | $ 4,312.00 |
| 12/31/2004 | KPC cost to burn more expensive fuel (oil) during water blasting | $ 2,965.00 |
| 1/14/2005 | KPC cost to burn more expensive fuel (oil) during water blasting | $ 2,588.00 |
| | **Total Cost of Extra Fuel** | **$ 9,865.00** |
| | **TOTAL COSTS** | **$ 498,981.48** |

In support, Katahdin filed the affidavits of two Katahdin employees: Rodney D. Morrow, the Day Supervisor for Utilities and Thomas W. Malikowski, Mechanical Engineer. *See* Docket #8, 9, Exhibits A-R. Katahdin attached extensive documentation, including correspondence, purchase orders, work orders, and damage calculations. *Id.* Katahdin's memorandum placed these affidavits and exhibits in context, clearly explained the factual and legal bases for its damages claims, and reconciled overlapping claims. (Docket # 7).

In accordance with the directive in *KPS,* this Court reviewed the complaint and the accompanying affidavits to determine whether there are discrepancies or other matters that would mandate "further inquiry" given the nature of Katahdin's claim. *KPS,* 318 F.3d at 18-19, 21. To the contrary, Katahdin's submissions are thorough, well explained, and fully documented. Having determined that U&R has been properly defaulted and having reviewed the detailed damages evidence Katahdin has supplied, this Court concludes that Rule 55(b)(2)'s hearing requirement has been satisfied and it is unnecessary to proceed with a more formal evidentiary hearing.

### III.  CONCLUSION

This Court GRANTS Plaintiff Katahdin Paper Company's Motion for Default Judgment and AWARDS damages of $498,981.48 in favor of Plaintiff and against Defendant.

SO ORDERED.

                                          /s/ John A. Woodcock, Jr.
                                          JOHN A. WOODCOCK, JR.
                                          UNITED STATES DISTRICT JUDGE

Dated this 30th day of August, 2005